VOIR DIRE - PARKER                                    20

1  Q.   45f, why did you document this graffiti as a gang

2  detective?

3  A.   It says, "Valentine Bloods."  And it's on the same

4  basketball court with the previous two graffiti pictures.

5  Q.   And 45g, as a gang detective back in 2005, what made you

6  document this particular gang graffiti?

7  A.   "311" and "C-killer" is Crip killer.

8        MS. GREENE:  Those are my questions with regard to

9  this particular set of exhibits.

10        MR. POTOLSKY:  Your Honor, as to Exhibits b and g,

11  we have an additional objection other than what's previously

12  been stated.

13        Now understanding what the detective is ready to

14  talk about as to b and g, we believe under Rule 403 they

15  should be excluded because the additional probative value is

16  far outweighed by the danger of unfair prejudice.

17        I'm going to ask the Court to keep in mind that none

18  of the defendants in opening statement or throughout the trial

19  or I expect in closing argument are going to be disputing that

20  the Bloods is an organization.  The probative value at some

21  point reaches overkill and unfair prejudice.

22        In b, the "Mecca" is "Murder every Crip child

23  alive."  And in g it says "Crip killer."

24        Now there's plenty of other photographs, plenty of

25  other graffiti that can establish the type of stuff the

21

 1   government wants to do.  But to have these defendants

 2   confronted with graffiti that was written by unknown people

 3   when they were 11, 12 years old, and as far as I know

 4   unconnected with the Bloods as a group, is unfairly

 5   prejudicial for the violence that's contained in that

 6   graffiti.

 7          So in addition to the other grounds, we would add a

 8   Rule 403 objection, specifically as to b and g.

 9          Having said that, the limited taste of the

10   testimony, it doesn't appear that those limited questions are

11   really calling for hearsay answers.  I mean, I think in

12   candor --

13          THE COURT:  The only one that does would be where

14   saying that "B Ford" stands for the Beatties Ford Bloods.

15          MR. POTOLSKY:  Yes, sir.

16          THE COURT:  He can testify that there is a group

17   called the Beatties Ford Bloods.  But he can't say that "B

18   Ford" means "Beatties Ford Bloods."  That was the only one

19   that I thought was an opinion about stating what a particular

20   thing said.  But the other -- did the other -- did g say "Crip

21   killer" or was it a C with a mark through it that means "Crip

22   killer"?

23          MR. SMITH:  That was the point that I was just

24   fixing to raise, Your Honor.  The fact that you just asked

25   that question and that he testified to explain that issue that

22

1    you just asked the question about —

2              THE COURT:  Yeah.

3              MR. SMITH:  — was what I was fixing to raise was

4    that that next step of him explaining and interpreting that,

5    it goes across that line of what we have been talking about

6    for the past five or ten minutes.  It's, I mean, I agree.  The

7    fact it says "Valentine Bloods" that's self-explanatory.  The

8    fact that the other one has Blood in the middle star is

9    self-explanatory.  It's that second step, again, with what

10   looks like either a 3 or —

11             THE COURT:  One is a C and one's a 3.

12             MR. SMITH:  Well —

13             THE COURT:  Looks like it.

14             MR. SMITH:  I mean, it's a backwards C, if anything,

15   with a line through it.  But again, that takes that second

16   step of interpretation that we've been discussing that we find

17   objectionable.

18             MR. CULLER:  Your Honor, I want to add that — well,

19   there is an opinion from the Fourth Circuit, United States

20   versus Williams.  And it actually speaks to Agent Parker

21   testifying as a lay witness.  And they find it's harmless

22   error because they find there's plenty of evidence in the

23   record to support the jury's conclusions as they pertain to

24   that defendant.

25             By the way, one of the defendants was acquitted in

1  that case and that was upheld or, excuse me, she was convicted

2  and her conviction was reversed on appeal.  I'm sorry — but

3  the — I mean, they go into detail about, you know, Agent

4  Parker being used as a lay witness —

5          THE COURT:  Give me the cite and I will look at it

6  when we break.

7          MR. CULLER:  Yes, sir.

8          MR. WEIDNER:  Your Honor, it's the Fourth Circuit

9  Court of Appeal, number 14:4866.  And the section of that

10  opinion that deals with Detective Parker's testimony — and

11  that was a Bloods trial case.  It begins at page — at the

12  bottom of page 15.  It runs for two or three pages.

13          THE COURT:  I'll take a look at it.

14          MS. GREENE:  I know the Court's going to look at it.

15  First of all it's an unpublished opinion.

16          MR. CULLER:  It is.

17          MR. WEIDNER:  It is an unpublished opinion.

18          MS. GREENE:  But I just want to point that out.  But

19  I believe the section that pertains to Detective Parker's

20  testimony, I know the Court is going to look at it, I don't

21  think that the Fourth Circuit found that it was error.  I

22  think the Fourth Circuit said, "at most it would have been

23  harmless error."  The Court can go back and look at it.  I

24  can't recall.

25          THE COURT:  What I'm saying is, some of the stuff is

24

1   factual.

2          MS. GREENE:  Right.

3          THE COURT:  This is a gang officer who is taking —

4   who is — who finds these things to be important for him to

5   document.  And that's — there's nothing wrong with that.

6   And — but the problem can get there when opinions come up

7   like a C backwards means "Crip killer."  That is not going

8   to — you'll be able to get a witness — one of the guys will

9   get up here that will tell you what that means because they

10  all know it.

11         MS. GREENE:  The other thing, Your Honor, to the

12  Court's point, he's a fact witness.

13         THE COURT:  He is a fact witness and then you can go

14  over opinion.

15         I'm going to read Williams and take a look at it.

16  You guys take a look at it —

17         MS. GREENE:  It also had to do with him interpreting

18  code in jail calls is what that portion of the opinion is

19  about, I believe, was.  That in a Bloods trial they had

20  Detective Parker talk about what he meant about certain drug

21  codes were in wiretaps, I think.  It didn't have to do with

22  him explaining graffiti photographs that he had taken or

23  anything like that.

24         THE COURT:  Right, but it's explaining things.

25         MS. GREENE:  It is.

25

1          THE COURT:  That's where the — those that are in
2   the middle of it, that live it, can tell what it means.
3          MS. GREENE:  Right.
4          THE COURT:  But someone else who is not living it is
5   in a position of being a fact witness maybe and maybe an
6   expert witness.
7          Let me take a look at the opinion.  And there's no
8   point in, you know, I wanted to know whether — if it's — if
9   something is, you know, been found — is error but harmless
10  error.  I don't want to commit any error.  I mean, I'm going
11  to commit error in every single trial I do, most of it
12  harmless.  Because I'm very, very careful about it.  But
13  nobody tries a perfect case.  And the Court tries to avoid any
14  error that it can.
15         So I will take a look at what that case says, and
16  you all are going to have to object on these things.  I'm not
17  going to give you a blanket objection so that you all can pour
18  through the transcript looking for error at a later date.  If
19  you got something to object, object.
20         MR. CULLER:  Yes, sir.  I was just going to say, I
21  have the opinion cued up —
22         THE COURT:  I think David's got it for me right now.
23         MR. CULLER:  Very well.
24         THE COURT:  You give us a cite and we can pull it
25  up.  He usually pulls stuff up before you guys do.  If you got

26

1    something we don't have, we'll get it.

2          MS. GREENE:  Your Honor, I would also point out 701

3    lay witness testimony, as well, things that he has observed

4    and perceived and testimony based upon his own perceptions, as

5    well.

6          THE COURT:  Okay.  I'll take a look at it.  Do you

7    all have Williams there to look at, the case?

8          MS. GREENE:  Your Honor, I don't have a copy of it

9    in front of me.  My recollection is that the section on

10   Detective Parker's testimony is relatively short.  That issue

11   that the defendants objected to and my recollection is, it had

12   to do, again, had to do with his interpreting code, coded

13   words in telephone calls.

14         THE COURT:  Okay.  Very good.

15         MR. WEIDNER:  Your Honor, I have a copy of the

16   opinion on my computer but unfortunately, I don't know why,

17   but I'm not able to get on WiFi in the Court.  So I can't

18   email it.  But Ms. Greene is welcome to read it on my

19   computer.

20         THE COURT:  They're probably jamming you.

21         Mr. Davis, you go ahead and make another copy of

22   that for Ms. Greene and Mr. Gast.

23         Let's go ahead and take a break.

24         Fifteen minutes or it could be longer, depends on

25   how long it takes me to digest this material.

27

1          (Recess from 10:17 until 10:38.)

2          THE COURT:  Okay.  In the Williams case, United

3   States versus Williams, is one of the folks in this case.

4   What happened was the interpretation of telephone calls by

5   both the officer and the — and some of the defendants.  The

6   Court didn't find any problem with the gang folks saying what

7   "feed the plate means" and all those things mean.  None.

8          What the problem was that the officer's

9   interpretation of what the call said which was found to be

10  harmless in that all the other people said the same thing.  It

11  meant "kill the witness, kill the person."  All that was

12  allowed in, every bit of it, by the people that testified

13  about it.

14         So that's what I'm going to do here.  We're not

15  going to have them — the officer can testify what he took,

16  what pictures he took and why — and as part of his being in

17  the gang group that he's trying to investigate.

18         The Court's going to allow all of the pictures in.

19  I've done the 403 balancing test and I find that in a case

20  where the allegations are about murder and racketeering and

21  robbery, that the probative value of these in terms of

22  determining what this gang is involved in as part of their

23  racketeering, outweighs any prejudicial effect as to what is

24  said in these.  I am not going to allow an interpretation of

25  any of this.

28

1        For instance, he can -- if you have -- that it's
2    something Blood or whatever, he can't testify what that means.
3    You can ask him another question as to whether there's an
4    organization in Charlotte that goes by such and such.  Then
5    the jury will have to interpret that.
6             MS. GREENE:  I can or cannot ask him that?
7             THE COURT:  You can.  You can ask him if there's an
8    organization in Charlotte known as such and such.  And then
9    they can make the — they can decide whether that means that.
10   If they want to spend hours arguing that it doesn't mean that,
11   they can.  They can do whatever they want to do about it.  You
12   can't testify that a C with a mark through it means "Crip
13   killer."
14            MS. GREENE:  Understood.
15            THE COURT:  That will be whatever that shows.  So
16   what I will allow him to do is testify about facts, what he
17   collected.  And then I've already heard testimony about some
18   of these things.  Some of these things I know what they mean
19   because I've heard testimony about what they mean in the
20   group.
21            He can look at Facebook pictures and say, "Did you
22   see — any of your pictures have any of this in it?  Yeah."
23   Then you put that picture up.  And then you can put the
24   Facebook up.  If one of them has something in it that matches
25   up to this graffiti, it matches up to the graffiti.

29

1          But you have to have somebody else testify about

2     what some of this stuff means.  It was pretty clear.  This one

3     was all agreed in it.  It was Agee, Wynn and Schroeder from

4     the Middle District that ruled on this case and it is

5     unpublished.  It's not exactly what the defense says that it

6     says.  But it's the interpretation by the officer that was

7     error.  It's not — the members of the gang can tell the folks

8     what it means.  And these people will understand it.  They'll

9     either decide these folks are in the gang and in the

10    conspiracy and did this or not.  It's going to be up to the

11    jury to make that call.

12          MS. GREENE:  Very well, Your Honor, understood.  And

13    I just want to make sure that I am complying with how the

14    Court wants Detective Parker's direct to go.

15          Could I direct questions to him — without him

16    saying what anything means.  But could I say — the Court just

17    said kind of like comparing things.  Could, for example, if

18    he's reading, reviewing a Facebook post that say, that has,

19    for example, the C crossed out in a Facebook post —

20          THE COURT:  Um-hmm.

21          MS. GREENE:  — could I, without him saying what he

22    thinks it means, could he say that he has seen Bloods members

23    cross out C's before.  Or he has seen that in all his years of

24    investigating Bloods without saying what it means.

25          THE COURT:  Not unless — not unless he seen him do

1    it.  If he has a Blood member doing this to a C.  No, he's not

2    going to say that in his investigation he's done that.  This

3    is pretty clear.

4           All the stuff is on the same basketball court.  A

5    lot of the stuff is put together.  Valentine on the sign.

6    Murder every, whatever.  And then the C crossed out and

7    "killa" is there.  Somebody is going to say what that means

8    other than him.  And if they don't then that's too bad.

9    You're not going to recoup expert testimony through lay

10   testimony.  But you will get lay testimony.

11          And any fact that this witness knows he can testify,

12   and any member of this organization can say what those things

13   mean inside the organization.  They can, you know, they can

14   cross-examine them as snitches all they want and the jury will

15   decide whether they're telling the truth or not.

16          But it's going to be up to whatever — whatever the

17   jury finds is the truth of this.  And on this testimony, no.

18          What he can do is, if you got something like a C

19   crossed out, you can point that out and you go right back to

20   that picture and show him that picture.

21          MS. GREENE:  Right.

22          THE COURT:  And let them make the call.

23          MS. GREENE:  Okay.

24          THE COURT:  Cause they're probably not going to hear

25   anything that that has anything to do with, well, that's about

1    the Lord or something like that.  Because nothing is coming

2    that's going to explain that other than what's there and

3    there.

4                MS. GREENE:  Okay.

5                THE COURT:  But I'm not going to -- no opinions.

6    That's where the Court got into that with this specific

7    witness in this district, and that is interpretation by a lay

8    person of -- the people in the gang can say what it means.  I

9    mean, in this we already heard lots of stuff about what it

10   means, "on the plate, he's food" and all that kind of stuff.

11   Good Lord.  Grow up.

12               And then they got a -- let's see here.  In talking

13   about this says, "Barnett specifically identifies only one

14   challenged statement that pertained to him:  In Parker's

15   testimony the term 'eat the plate,' when used in Barnette's

16   phone call with inmates at the Bertie Correctional Center,

17   meant to follow an order, in that case, 'kill Del Ray

18   Jackson.'  Several other witnesses testified 'eat the plate'

19   meant to carry out an order and the gang members could be

20   ordered to attack or kill an identified person.  And

21   additional statements on the phone made it clear that Jackson

22   was supposed to be shot and killed."

23               So they did not find reversible error there.  And it

24   was fine for the members of the gang to say exactly what those

25   terms meant.

32

1          So we're going to hear a lot of testimony, if
2    they've got it from people, and they're going to be allowed to
3    testify about what those things mean, but you're going to have
4    to get it from somebody else beside him.
5          MS. GREENE:  Understood, Your Honor.
6          THE COURT:  He can testify what he saw.  He can
7    compare what he saw.  That's it.
8          MS. GREENE:  Yes, sir.
9          THE COURT:  Okay.
10          MR. POTOLSKY:  Judge, with regard to our specific
11    objection under Rule 403 as to — I believe it's Exhibit b.
12          THE COURT:  Yes, sir.
13          MR. POTOLSKY:  That's the "Mecca."
14          THE COURT:  Yes, sir.
15          MR. POTOLSKY:  Underneath "Mecca" someone else wrote
16    "murder every Crip child alive."  I believe that I stated this
17    as the ground previously but I just wanted to be very clear if
18    I had not.
19          If I understand correctly that was 2004 when the
20    picture was taken.  Mr. Hankins was about 11 years old and
21    well before he's alleged to have joined the group.  We don't
22    know who wrote it, what the context was.  We don't know who it
23    is that took the "Mecca" and then in a different color and a
24    different handwriting put in "murder every Crip child alive."
25          I've reviewed the case law on prejudice and

1    probative value with graffiti.  And when it is relevant to

2    motive or any other fact in issue I think it comes in.

3            For example, were this a Blood/Crip case, certainly

4    there would be some probative value to that.  Something that

5    was written before he's alleged to have been a member that

6    he's never approved, adopted, had knowledge of, et cetera, of

7    that nature is irrelevant.

8            In other words, there's no probative value.  It

9    doesn't make any fact in issue in this case against

10   Mr. Hankins more likely.  What it does is suggest to the jury

11   unfairly that he is a child killer.  And for that reason we

12   object under Rule 403.

13           THE COURT:  It does not show that in any way.  What

14   it shows is that at that time that the Bloods terminology and

15   use at that time in existence in Charlotte was there.

16           MR. POTOLSKY:  Which we don't contest.

17           THE COURT:  You'll be able to show that they have no

18   evidence that at the time that was done he was a member of the

19   Bloods.

20           If you want — at any time.  I mean, you can point

21   out that he was 11 at that time.  We have one witness who was

22   taken in at 11 by this organization.  Must make mothers and

23   grandmothers everywhere really happy their children are being

24   brought in.

25           But the — but in this particular case they're

34

1   trying to establish an organization that is involved in a RICO

2   and where it starts.

3           And the testimony that was allowed in this trial, in

4   that Williams trial, goes all the way back to -- some we

5   already heard -- to New York in 1993 and all that was found to

6   be relevant.  So this moving up to 2005 and 2004 is relevant

7   to this particular case as to the organization.

8           You're correct in showing -- saying that it doesn't

9   prove anything about any one of these three guys directly yet.

10  But it does show the organization that they're alleged to be

11  part of was in operation and using many of the terms that I've

12  already heard and may hear again from other witnesses.

13          MR. POTOLSKY:  Judge, we understand that.  I think

14  our point is under Rule 403, even relevant evidence should be

15  excluded if the probative value is substantially outweighed by

16  the prejudice.  We're not disputing that the Bloods are an

17  organization.  We're not disputing with this witness or any

18  other witness.

19          The slight, if any, additional probative value of

20  "murder every crip child alive" is substantially outweighed by

21  the inflammatory nature of that statement.  That statement

22  doesn't make any fact in issue in this trial against

23  Mr. Hankins more likely than without it.

24          And the Court, in admitting all the other graffiti,

25  does have the discretion to exclude that one photo because of

1   the grounds that we've been arguing.

2           THE COURT:  I appreciate the argument.  The Court is

3   going to use its discretion here and finds that it is more

4   probative than prejudicial.  And that the probative value in

5   the government's showing this organization is part of their

6   proof.

7           What I -- you know, it's a complicated indictment.

8   We're trying to do the instructions on that and we've got

9   about several different ways.  We got North Carolina law

10  implicated, federal law implicated, South Carolina law

11  implicated.  It may take me two days to read the instructions

12  in this case.

13          MR. SMITH:  We would just preserve that objection,

14  as well, Your Honor.

15          THE COURT:  Absolutely, that objection.  You all

16  want to make it, too, Mr. Foster?

17          MR. FOSTER:  Yes.  Thank you, Your Honor.

18          THE COURT:  Mr. Foster, yes.

19          Certainly.  I think it's very probative.  But I have

20  looked at this.  I appreciate you all pointing out the

21  Williams case.  And I think that I see a very strong line that

22  I can require the government to follow and take care of it in

23  that way.  So that's what I'm going to do.

24          You're going to use him as a fact witness and a fact

25  witness only.  I'm not going to allow opinions to come into

36

1    the case.

2            MR. POTOLSKY:  Understood.  Need we object again in

3    front of the jury as to photograph B or Exhibit B?

4            THE COURT:  No.  No.  That — no, your objections —

5    but what I'm just saying is and we can't take — we're not

6    going to be able to take a sidebar like this on every single

7    objection.  This one I'm glad it worked out this way.  But I'm

8    not going to send the jury out and — although it's quicker

9    for us to go into the side room, I think it's

10   counter-productive to have the defendants staring at the jury

11   while we're out.  I think that's counter-productive to what

12   we — to this case.

13           So we're not going to be taking many sidebars out.

14   So understand that you may have to state your reason for an

15   objection on the record.

16           And I've been around long enough.  If you can do it

17   for a limited purpose that I understand.  If you say,

18   objection, you know, 403.  I understand what you're objection

19   is there.  But you may have — something I don't understand

20   you may just have to explain.

21           And if it's very — its highly prejudicial that I

22   need to hear it outside the jury, we will take sidebars.  But

23   I'm not going to — this has interrupted this case for nearly

24   an hour and — not unfairly, not wrongly.  But if we did this

25   all the way we would be trying this case till Christmas.

1          So anybody not understand where we are on this
2    witness?

3          MS. GREENE:  I think we're — I think we're good,
4    Your Honor.

5          MR. SMITH:  Yes, Your Honor.

6          MS. GREENE:  He can't say what anything means but he
7    can read things into the record or say what was done or what
8    he saw or what he did.

9          THE COURT:  I'm going to let him — I'm going to
10   allow all those pictures that you've shown so far into
11   evidence.  I'm going to allow the Facebook pictures into
12   evidence.  If there's some that — subject to — if they have
13   an objection, a 403 objection, I'll consider that.

14         But generally he's competent to testify about all of
15   those things that are facts that he has seen as an
16   investigator and that can be hard facts.

17         The interpretation of it is going to have to be left
18   up to the jury or the people that are inside the organization.
19   They can testify about what that stuff means.  They're living
20   it or not, as the case may be.

21         All right.  Let's bring the jury in.

22         (The jury was returned to the courtroom at 10:54.)

23         THE COURT:  Okay.  The witness may be seated.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  Thank you for your patience, members of